in the official capacity as Secretary of Commerce, et al., Mr. Mulvey, for the assailant and Mr. Mullaney, for the attorney. Good afternoon, Counsel. Good afternoon, Your Honor. Good afternoon, Your Honors. May it please the Court, I'd like to reserve five minutes for rebuttal. With the end of Chevron deference, this case, I think, presents what should be a straightforward question of statutory interpretation. Does the Magnuson-Stevens Act expressly authorize the government to require industry-funded monitoring in the Atlantic herring fishery? The steps involved in that task, I think, are also well established. The Court must start with plain text. It should then examine the overall statutory context. And finally, if needed, the Court can consider statutory history. At each of these steps, text, context, and history, the fishermen offer the best reading of the law. Let's start with text. Consider Section 1853b-8, which I would note was the only statutory basis cited by the government in its final rule for its authority to implement the Omnibus Amendment. That provision allows for vessels to be required to, quote, carry, end quote, an observer. The ordinary meaning of carry, though, refers only to things like bearing, transporting, and conveying. There's no inherent connection between carrying a monitor so that he can perform his information collection duties and paying that monitor's salary. Section 1853b-14's necessary and appropriate clause... Just on b-8 for a second. I mean, even if there's not an inherent connection, I guess I'm not sure that it's an inherent disconnection either. And so if we just think 8b-8 allows for the Secretary to require carrying of observers, and then doesn't itself answer the question of whether the Secretary can require vessels to pay for the observers. And let's just assume that for a second just for now. You may resist that, but just assume that for a second for now. It doesn't mean to say that it doesn't shed light on it in one direction or the other. It's just that the text doesn't dispose of it. I guess my question would be if we look at b-4, which talks about prohibiting, limiting, conditioning, or requiring the use of specified types and quantities of fishing gear, fishing vessels, or equipment. It just feels to me like we'd be kind of saying the same thing, which is that requiring the use of those things can require the use of them, just like it can require the carrying of an observer. And it just doesn't in and of itself tell you who, as a textual matter, who's going to pay for that. Well, I think there is a bit of a difference. I mean, to require the use of something implies different things than to say you have to carry X person on your boat. So, I mean, the regulatory costs that come from saying the government can require certain types of vessels or nets or gear is a little bit different than the statute saying explicitly you have to accommodate X person on your boat. But I also think there's a difference in the nature of what you're suggesting, I think, is that the pain of the monitor's salary and his travel costs can be a form of a compliance cost. There's a difference in the nature of... I'm not necessarily saying that. I guess, I mean, we'll go there. I'm sure we'll explore that. I guess all I'm saying is that the text of the provision, are you saying that V-8, because it uses the term carry, definitely means carry but don't pay, someone else will pay? That would be my position. And I do think that there is a meaningful textual difference between the word carry and require the use. I'm reminded that Judge Walker, I think, in his dissent in the court's last opinion, kind of explored some of this and why that might be the case. But I think even if we look historically to how the agency has understood the term carry in its implementing regulations for observer programs, including for most of the history of the MSA, for the observer programs that were always funded by the government, carry was understood to include things like give a birth to the monitor. You have to give up a bunk. You have to feed them. You have to make sure that they have access to the hold. They can use communications equipment as long as it's work related. These are the sorts of things that I think go very well in which the agency, the government, has always understood to go very well with this sense of carry. Is it your position that the agency never required anything beyond that with respect to observers that were carried on board a vessel? So there are, I mean, we want to talk about the history of observer programs. From the implementation in 1976, the first attempt at industry funding is in 1990 in the North Pacific. And then as we explained in the briefing, immediately the government stepped in, excuse me, Congress stepped in and with the 1990 amendments, our view is that they created explicit authority to ship costs through a fee system with the North Pacific Fisheries Management Plans. But from then on until the beginning of the 2000s, there's no mandatory industry funded observing program anywhere. And what you do have is with federally funded programs, implementing regulations that make clear that the vessel owners and operators are responsible for accommodating and feeding and then these other things like give them access to the bridge and so forth. Council, let me just ask you in that connection, can the government in that regard to carrying impose certain requirements? For example, that the bed will be comfortable, that it will have blankets such that the observer can be kept warm, that the observer will have three meals a day and they will be healthy meals in accord with national standards. In other words, I see your argument as not suggesting that the federal government cannot do those sorts of things with regard to quartering. Have I misunderstood your argument? So in a funny way, the government already requires some of that. It's explicit in the statute, right? So if we look to the exception. I'm talking about what is beyond the statute, TORI text. We have the word that quartering. Yes. Yeah, that's what I was about to talk about. I mean, you can have things that insofar as there is an exception to B-8 where there's unsafe conditions, I think the implication there being at least at a certain level, you're right, the government is going to be able to say, you know, it has to be a safe place to sleep. Whether or not, you know, a pillow is required, I mean, that might get more into, you know, arbitrary and capricious review and, you know, whether it's really given the national standards. Well, if someone comes on board who has a sinus condition and therefore, hypothetically, needs another pillow. All I'm trying to understand is the extent to which you are reading the Supreme Court's remand to this court to require in the absence of Chevron that the only way a court could conclude that the challenged cost is authorized is if Congress expressly says you, the fisheries, shall pay the annual salary, you know, prorated for the number of months you use him. Well, I don't think B-8 is going to get you with your hypothetical, Your Honor, to where you are. Well, yes, Your Honor, that any assertion of authority by an agency is going to have to be found expressly in the statute. Now, the court, as we recognize- No, no, no, no. Hear my question because I'm just quoting what you said in your opening remarks. And what I'm trying to understand is when the Supreme Court says courts shall decide and use the normal tenets of statutory construction, that to me did not, and maybe I'm incorrect, that did not mean to me that the court could only rule if it could find and express, or in your terms, an explicit statement by Congress that the fishermen shall pay the salary of the observer. Well, I think it does, Your Honor, and if I could read this sense of two responses to that. I mean, first, insofar as this court in its previous opinion took for granted that silences or ambiguities could give rise to implied delegations, the Supreme Court has made clear that that's no longer acceptable. But you heard my question, did you not? Right. Because the Supreme Court clearly stated that the courts could probably apply the usual tenets of construction in interpreting a statute, whether it found that statute to provide explicit authority or it was ambiguous as to whether the authority existed. Yeah, so as I was going to say, on page 2255, I think the court says implicit delegations, that presumption of permissibility of implied delegations was wrong before, and now with Chevron gone, it's definitely wrong. Now, there can be delegations, so the Chief Justice says you can have delegations, Congress can tell an agency, direct an agency is the language he uses, define this term, fill in this gap, or, you know, we're going to recognize that Congress explicitly through the use of certain capacious terms can give some discretionary policymaking to an agency. Now, it's still an express delegation, it's just that the language that's used is capacious, it gives by its very nature some movement to the agency to move about with its regulation. And one of the words he used… If you could still, I mean, there's no doubt a statute can, without specifically saying that costs are going to be borne by the regulated entity, a statute can still be best read to allow for that. You don't need explicit text. One thing in the Supreme Court's opinion says that you have to have explicit text about the specific thing about costs, otherwise costs can't be imposed on a regulated entity. There's no reason to think the language about that is different from the language about anything. What the Supreme Court said is you can't give the agency the benefit of the doubt based on delegations of authority. It has to do the work to figure out how you think the statute is best read, but it can still be best read to accomplish that result, even if there's not direct words that point in either direction. Well, I mean, as applied to this case, what's important, I think, to keep in mind is that the paying of the monitor salary is not a compliance cost, right? Given the very nature of the job of the observer who's serving an inspectorial function, an enforcement function on the boat, it's really not a compliance cost. Right, so if you thought the way the world worked is that the only thing that can be implied to come along is compliance costs, and this falls outside of compliance costs, then, I mean, I understand the syllogism. But in terms of the idea that, in response to Judge Rogers' question, that you don't have to have, as an abstract matter, an explicit test that assigns costs or fees or expenses. I don't want to get fixated on the word costs, but expenses to a regulated entity. There's nothing in the Supreme Court's decision that says that. There may be in some particular context that that's how a statute is best read, but the Supreme Court's decision in Loper doesn't tell us that directly, right? We just do the work of figuring out what the best reading of the statute is. Sometimes it's going to be written on the bare text of the statute. Sometimes it's going to require us to do some reasoning based on the statutory context and the way the positions interlinked and things like that, right? I mean, that's just basic statutory interpretation. I think the general thrust, though, of the Supreme Court's elimination of Chevron and clarification about what courts are supposed to be doing, though, is that everything needs to have a textual hook. I mean, so there can't just be... In either direction, then. It's not tilted in either direction. You'd have to have one, too, then. Yeah, but I would say, in this case, though, I mean, if we look back to what this court said, in its opinion, on 368, I mean, it said that you took all of the canons, you applied them, and the government lost it, step one. And the only reason why it moved it... The government lost it, step one, under our decision? Yeah. I mean, here, so page... Step one? 368. Nothing in the text compels the service's interpretation. Neither 1853b8 nor any other provision of the Act explicitly allows the service to pass on to industry the costs of monitoring, nor do the traditional tools of statutory interpretation provide any other basis on which to conclude the Act unambiguously supports the service interpretation. Unambiguously. So I don't... Right. I have a hard time understanding how our... I mean, I don't know why we're even debating this. I have a hard time understanding how our previous decision is best understood as a Chevron step one resolution. No, it's not a step one decision. It's the government lost it, step one. You moved to step two. Oh, well, the government loses step one. They just didn't win at step one. I don't know what it means to say... The government losing at step one means that their reading is unambiguously foreclosed. The government not winning at step one and you not winning at step one means we go to step two. Right, but as I mentioned earlier, the court took for granted, in applying the Chevron methodology, that silences and ambiguities can give rise to implied delegations. So not only is the movement to step two gone, but the court has clarified that those sorts of things, you know, we can't give the benefit of the doubt to the agency. The government is the one... We don't get the benefit of the doubt either way. We just construe the statute to figure out what the right answer is based on all the tools of statutory construction that we bring to the table. Right, and if the government had met its burden to find statutory support for the legality of industry funding, I mean, we wouldn't be here now and the Supreme Court wouldn't have gotten rid of Chevron. I mean, this would have been resolved at step one. It may be that the formulation of step one, in your view, and that stated by the Supreme Court, is somewhat different. But, again, we can just look at what the Supreme Court said step one was all about. And if we couldn't conclude that Congress had, in your words, explicitly addressed the subject, then we would go to step two. But I want to get back to where you are now. And what I understood the Supreme Court to say is, in light of its instruction, this court was to look at the case in terms of trying to figure out what is the best reading of the text. Yes, ma'am. And I don't see, and I think you're conceding in your colloquy with the Chief Judge, that it doesn't have to be explicit. Because unless you do, then it means that we could never rule that the rule is as you object. Because Congress didn't say in the statute, industry shall never be charged for the cost of the observance salary. Well, I don't think I've conceded anything. I mean, Congress doesn't need to. As this court, even before the end of Chevron deference, had explained in cases like Ethel Corporation, I mean, Congress doesn't have to provide an explicit prohibition on the use of industry funding outside of the three contexts that we contend that there already is an explicit authorization. That's the wrong way to look at it. Because if that's the case, I mean, there's really no limit to what the government can claim. No, I don't think we're disagreeing about that at all, counsel. All I'm trying to understand is how far you want to go with your explicit requirement analysis. Because I thought what the Chief Judge's question was pointing out, then you have to ignore a lot of what the Supreme Court said when it sent the case back to us. Well, but even when you're, again, in the realm of where there's been a delegation of discretionary policymaking to an agency, that still has to be expressed. Now, the express can be, as I think in this case, we're in that third bucket of the types of delegations that the Chief anticipated might happen, right, where you have a term like appropriate. The court's job here is to determine what are the boundaries of what appropriate means legally. I mean, that's still dealing with expressed language in the statute. I mean, that's not moving into any sort of contextual. Of course. I mean, but suppose the statute didn't have necessarily appropriate language in it at all, and all it has is B-8. It's just the one provision statute that has B-8. That doesn't tell you who pays the expenses of it. Well, I think it does. I mean, you think it does because you think that it means carry and only carry, and the vessel shouldn't have to pay for anything beyond carrying, quartering, feeding, blankets, pillows. Yeah, the things that are incidental to carrying the monitor on the boat. And that's the historical understanding of the governments. I mean, even in its regulation today. You have to read the statute to figure out what the best understanding of it is, and I know that you have a position that you advocate that you think the most natural way to understand that is to go to some expenses associated with observers being on board, but not to the point of actually paying the observers. That's your assumption about what the better reading of it, and I think there's an argument on the other side that there's another reading that's different from that, and we have to look at the statute to figure out what the best understanding is. On that, you don't think that with respect to requiring the use of types and quantities of fishing gear, fishing vessels, or equipment, that that has to be read to mean at the expense of the government? No, I do. You do? Yeah. You think that before, if I can just finish. Yes. You think that before when it says require the use of specified times and quantities of fishing gear, fishing vessels, or equipment, if the plan takes that up and requires a specific type of fishing gear, that the government has to pay for the fishing gear? No. Oh, no, no, no. No, yeah. The government. I'm sorry. I misunderstood you, Your Honor. No, and I think in our reply brief, the government floated this idea, and I mean, honestly, I think it's a pretty far out there argument that the reading of that, I mean, to require the use of, in my mind, as I pointed out in the supplemental reply brief, I mean, that's sort of, it sounds imperative. It sounds like we're ordering regulated industry to purchase these types of gear. Well, they can borrow from a friend. No, it doesn't even say it has to be at your expense. It just says use. You have to use it. But it doesn't not say that the government has to pay for it. No, but I mean, there's no historical example of that. That's when you go to history. I mean, I'm just trying to understand, what is it about those words that tells you that requiring the use of specified fishing gear or fishing vessels doesn't mean require the use but only require the use? That doesn't mean you have to pay for it. We're just requiring. You may prefer to use a different type of vessel, but we need you to use this type of vessel, and, of course, we'll pay for it. So I'm reminded of Justice Barrett's concurrence. I think it was in Biden v. Nebraska that, you know, when we do textual analysis, we have to do it with an ounce of common sense, right? And when we read that phrase require the use of, I mean, the first thing I think is that nobody reading that would anticipate it to mean that the government is going to pay for it and that, you know, we have a nationalized fishery system where we're just fishing on behalf of the government. I mean, I don't think that that's the right reading. So you think there's a talismanic distinction in words between requiring the use of equipment and requiring the carrying of people, that when you say requiring the carrying of people, the only conceivable way to understand that without knowing it, there's no other provision to speak to, there's nothing else there. Requiring the carrying of people means inexorably you have to carry the people, which means you have to pay for their bed and their food and their pillows and their allergy medicines, but you don't have to pay their salary. It's just inexorably. You have the opportunity cost that, you know, you've given up a spot that one of your men would otherwise be on the boat. Yeah, those are the costs associated with having to carry. And there's a difference, and it's not just the textual difference, but, I mean, it's just the nature of the regulatory burden, right, having to use a certain boat, whether you're buying it or loaning it or borrowing it or whatnot. It's just different in kind from having to pay the salary of somebody who is acting on behalf of the government in an inspectorial and enforcement role. I mean, think, if you do buy the net, that's your net. Like, you're required to use it. What if it's monitoring equipment? So under B-4, it's to require the use of equipment for such vessel that fits within it. Yes. And the equipment that's at issue is monitoring equipment. Yes. So there's already statutory authorization to require vessel monitoring on commercial boats. So, you know, our fishermen have those on their boats, but that's a one-time cost to install the equipment, but it's still your equipment. I mean, I think there's just such a difference in kind. I mean, it's kind of like... I think you may be able to educate us on explaining why it's best to add in one direction or the other, but I don't want to think I would assume that it's obvious. And so I guess where I'm going is if the statute allows the agency to require vessels to carry monitoring equipment, let's just suppose we get to a stage where we have equipment that just can do the same thing as people. So it requires, instead of, you get to choose. You get to have human monitors or you get to have machine monitors. And it sounds like if the agency requires the machine monitors, then the best way to read the statute is that the operators have to pay for it. But if the agencies require the human monitors, then the best way to read the statute is that the agency has to pay for it. I mean, that may be, but we'd be dealing with different statutory provisions. We wouldn't be talking about what the meaning of B-8 is. But we'd be talking about B-4 and B-8, right? We wouldn't be talking about B... If we're talking about electronic monitoring, we're not in the world of B-8. B-4, B-4. B-4, but I think there's a separate provision in 1853 that deals with positioning systems, which is what VMS or vehicle, sorry, vessel monitoring system. Yeah, there's one provision, actually, in 1853A. There's a provision in 1853A that I'm going to have to deconstruct. 1853A, C1H. So, 1853A, C1H, and then it talks about a limited access. We were in the limited access program. Oh, yeah, that's not Herring. Herring isn't a limited access program. No, I know that, but it's still a provision in the statute. That provision comes up because you all rely on it for other reasons. Yes, yes. And in H, it talks about a limited access privilege program shall, various things, include an effective system for enforcement, monitoring, and management of the program, including the use of observers or electronic monitoring systems. So, you can either use observers or you can use electronic monitoring systems, I guess. In a lab, yeah. In a lab? In a limited access privilege program. Okay, thanks. Which is, and right, and the fact that it, and not only does... If I could just finish? Oh, yes, sir, I'm sorry. No, no, no worries, no worries. So, including the use of observers or electronic monitoring systems. So, I guess what I'm wondering is, since it says observers or electronic monitoring systems, is that connoting that that function can be carried out either by an electronic monitoring system or by an observer? If it's an observer, then it's one set of things kick in. If it's an electronic monitoring system, another set of things kick in. And then if you take it outside the lab context, thank you for the acronym, if you take it out of the lab context and you put that elsewhere, then you would say for the observer part of it, obviously the agency has to pay. For the electronic monitoring system part of it, which is an alternative, obviously the operator can pay. Yeah, I think that's right. And I actually have, from a different statute, maybe it's a helpful example. I mean, because I think it's striking how after all these years, the government still hasn't given us an example of where this sort of like inspection enforcement regime is sent out to a third party and then paid for by regulated entities. I mean, that's striking. But I was thinking of the 49 U.S.C. 44917, which are federal air marshals, where it says that commercial carriers, airlines, have to carry a marshal on the plane and then along with that they have to do things like give them priority, give them the seat that they want, they have to keep secret that they're on the thing. I don't think anybody would read those provisions and think then American Airlines has to pay DHS's law enforcement official their salary while they're sitting on the airplane. What carry means is we're going to make space. We may have to bump a passenger, just like we have to bump a fisherman, but we get them on the plane, they're there, you know, we make sure that they have what they need. But we're not paying their salary. I mean, that's a governmental function. That comes from the context of what they do. And I don't think it comes necessarily from just the word carry. I mean, you could have that you're carried when they don't have other responsibilities beyond that. In that instance that it's an inherent governmental function or something like that? It's just that something else is informing us that the person that's required to be carried has to be paid for by the government rather than by the operator that's doing the carrying. And that may well be the answer. I don't think there's anything in that statutory provision, but we can just look at it to the nature of what they're doing. And I think that the marshal is more similar to the at-sea monitor than dissimilar from her. Based on what they're doing. Based on what they're doing. Yeah. Can I ask you about page 32 of your supplemental brief, which is the last page just before the conclusion? I suspect there's an easy answer to this. Maybe I'm just not familiar with the typographical style. But it's got these flashes at the bottom there. That's just that the page, there's not missing text. Okay. To let you know to read on to the next page. That's the end of that page. There's nothing further. And because we just put conclusion on the next page. Sorry for the confusion. I'm sure my fault. This rule was in existence for some number of months or years, and then it's been suspended since April of 2023. Does that raise any kind of standing or mootness problems for you? Yeah, I don't think so. For two reasons, at least. First, the government, in its supplemental brief, it provided an updated statement of the case in its view. And I think its last line was, even though we've temporarily suspended this, we reserve the right to reimplement it. I mean, it's on the books. It's technically the regulation. You know, the rule for the herring fishery. So, there's also, the MSA also has a statute of repose. So, you know, all challenges have to be brought in 30 days. So, you know, if the case were to be dismissed now in some way, that's it. I mean, there's no way to re-challenge the omnibus amendment, because 30 days from its promulgation has long passed by now, by, you know, three and a half, four years. It wouldn't be considered kind of a re-promulgation if it was brought back? No. Well, it wouldn't be. I don't think it would. I don't quite understand exactly what you mean. I mean, if this case is gone and the regulation stands, and not just the implementing regulations, but more importantly, the fishery management plan as amended by the council, I mean, it's still on the books. Yes, and I think I agree. But just to talk it through, right now you're not being injured by a requirement that you pay for the monitors. We're not having to pay for monitors at the moment. So, you're not being injured right now? I mean, there's always, I think, an imminent threat. I mean, it's on the books. So, my next question is, it seems like you're not being financial. Let's just stick with money. You're not out of pocket anything today? Not today. And you might argue that it's imminent that you will be out of pocket. I guess that's your argument? I mean, it's not going to require a regulatory action for the government to bring this back. I mean, what they normally do is they send out an email to all the fishermen. And they might do that today at 5 o'clock. They could do it today at 5 o'clock. But they might not do it today at 5 o'clock. They might not do it today at 5 o'clock. They might never do it. I mean, I don't think it's likely they'll never do it again. And do you think they will do it? Well, I mean, honestly, if they win this case, I think, the next day, they're going to bring the monitors back. And they say they're going to do it the next day. I mean, that's speculative on my part. But, you know, I don't think that's completely out of the unreasonable to expect. They say they stopped because they ran out of money for the administrative costs. That, yes. I don't think you need to go as far as you did to say that the case still might not be moved. It doesn't have to be that the government is not actually being accurate about their reasons. No, that's not. The burden would be on them to prove that they, under voluntary cessation principles, that the same injury can't be reimposed on you, if I'm thinking about this correctly. Yeah. I don't think they've tried to. I'm not disagreeing with that, and I'm not disagreeing with you. I just wanted to think it through. If there is that 30-day repose list, I take it you're saying that's in the Fisheries Act, not in APA. No, that's in the MSA. That's in the MSA, yeah. Correct. And, I mean, I'll give you a relevant anecdote, but, you know, one of the other programs where there is industry funding, although the fishermen dispute its legality, is in the Northeast Multispecies Groundfish Fishery. So, if you saw the movie Coda, it's like the guys who catch cod and stuff on the bottom of the ocean in Boston and in Massachusetts. You know, that was 2010 with Amendment 16, and even though it said we're going to have industry funding and you're going to be required to enter contracts, immediately after it was promulgated, the government said, we're going to, for the foreseeable future, we're going to continue to pay for this, so don't worry about that. We're not going to enforce that part of Amendment 16, and it did that for five years. And then when it finally said, it sent an email and said, as of this date, you're going to have to start reporting your trips so we can assign a monitor, and you're responsible to get a contract in place if you don't have one already, which, technically, they were required to have. I mean, at that point, when the fishermen sued, and that's the Gaithel case, and I represented the fishermen with my colleagues in that case, we lost on procedural grounds because it was too late. She won that. Right, so the First Circuit never addressed your merits argument. Correct. It never got to the merits. Yeah. Which is an important point, I think, because the district court here, and I think even the First Circuit, pointed to Judge LaPlante in New Hampshire, his reasoning, but, I mean, really, that's all dicta because the case was decided on procedural grounds that it was untimely. The corner post argument that applied to the statute of limitations for the APA, that type of argument wouldn't work to extend your proposed period? I don't think so, because corner post is not about statutes of proposed. It's about statutes of limitations. Okay. I'm good. I mean, getting to speculation, I know, but the Appropriations Committee directed NOAA, in connection with its fiscal 80-24 budget request, to come up with a report to the committees about various costs, including costs for the monitoring. And reading between the lines, the implication is that the Appropriations Committees are looking toward federal funding of the monitors, but we don't know. And we don't know what NOAA is going to propose in its, well, I guess we do, so you would know now what NOAA had done for fiscal year 24. I will be honest. I haven't looked at the new appropriations to be able to see what's happened. But, in fact, when I was rereading the principal briefing here, we actually addressed this because the government, in its supplemental brief, talked about the fact that in the ground fish fishery, which is the gazel case, that Congress, ever since that case was decided, has been telling NOAA, we're going to dedicate funding so that the fishermen don't have to pay. That's been the case. We addressed that in our original reply brief. I had forgotten about that. That's been the case from the beginning. I expect that that's going to continue. I disagree with the case. When you say you suspect what's going to continue, that's the government funding? That for the upcoming year, Congress is telling NOAA to pay the ground fish fishermen. Well, it said come up with a report that includes those costs. But it hasn't made any commitment, but presumably, I mean, this is all beyond the case. Yeah, that's right, Your Honor. The fiscal 24 appropriation act, has it passed? I actually don't know. Now, hopefully opposing counsel will be able to tell you whether the agency's been told to pay for the ground fish fishermen, but I can tell you up until now, every year NOAA has been told by Congress, here's money, pay for the fishermen. I mean, the government seems to- All we know, from the record in this case, is this one year when it's been done. But your colloquy with my colleague suggests we don't know what Congress is going to do. I should clarify that we're talking about two different fisheries. So the Gainesville case is ground fish in New England. Oh, I understand that. But I am talking about this case and the report that is in the appropriations report, talking about NOAA being directed for fiscal year 24, to include these monitored costs. For the herring fishery? But I don't know, for your clients, for I don't know what the outcome of that is. Nor do I, Your Honor. I'm sorry. No, that's fine. That's fine. I mean, it's not part of your case, but it's just as to how certain we can be as to what the Congress is doing or has done for fiscal year 24, if it's past the budget. Sure. I mean, perhaps implied in your musing is what we should glean from that. Either way, in terms of- No, it's not my musing, counsel. Let's be clear about that. You were asked a question by my colleague about mootness, since the rule is not being imposed against your clients. Well, the rule, I mean, it's been temporarily suspended according to an email. I'm sorry if that's- Your clients have been paid for what, fiscal 23. No, that is not true, Your Honor. So you're talking about the claims about the reimbursement. I mean, I can tell you with certainty that our clients did not receive any reimbursements under that scheme. And, in fact, if you read through the email- Why are we learning this in oral argument for the first time? Because the government made it clear in its supplemental brief that no one was suffering any fiscal injury as a result of being required to pay for the monitors, i.e., your clients. And I didn't see any response saying, not so. My clients were never reimbursed. The government, in its updated statement of the case, when it's talking about that reimbursement, without saying it explicitly, was suggesting on my reading that somehow we paid and were reimbursed. We were not- No, at most, and I get your point, which is well taken, but at most I read them to be saying that the check may not have been cut, but there's a check coming because Congress has agreed that your clients should be reimbursed for any costs associated with the monitors. Well, I would recommend- Well, Your Honor, if you read the actual notice from the September 7, 2023, Notice of the Status of Cost Reimbursement, I think that's what you're talking about, those monies were sent to not even any of the monitoring that's at issue in the case. It was sent for portside sampling costs, portside sampling, infrastructure upgrades, and monitoring- As an example, I'm talking about what was- and the government can explain, but what it said as to why there was no injury suffered by your clients. And I didn't read your arguments to say, not so, we continue to suffer because we're out of pocket. Rather, I thought your argument was along the lines of your responses to Judge Walker about how the agency could at any time send out another e-mail saying your clients have to pay. Have I just misread that? I'm still not entirely certain what report the government cited, and I'm happy to address that on rebuttal after opposing counsel has talked about it, but in response to Judge Walker, yes. I mean, my point was that this could be restarted this afternoon. Can I ask a question before you sit down about the permit sanctions, the penalty provision? Yes, Your Honor. Just to make sure I understand your position on that one, and I'm specifically looking at the one in 1858G, permit sanctions. So it has 1858GD, as you know. The text refers to any payment required for observer services provided to or contracted by an owner or operator who has been issued a permit or applied for a permit, et cetera, et cetera. So what's your understanding of the work being done by or contracted by an owner or operator? What does that show does exist, and how does that not show that there's an expectation or at least an engagement with the possibility that the owner or operator would be paying for the observer? Sure. So this section, 1858G1, and also the same relevant section that speaks about observers or monitors in 1857, were introduced in 1996 with the 1996 sustainable fisheries amendments. I mean, there was already statutory language about contemplating in the foreign fishery that there would be, in some cases under the supplemental observer program, direct contracting and payment for monitors. I mean, in my mind, considering that that was already in the statute, the addition of this provision, I mean, it has that in mind. I think that's the most common sense. I mean, your argument is that what it's referring to when it's speaking of observer services contracted by an owner or operator, it's only talking about the contemplation of that under 1812. Well, it could also be. So, I mean, there's another. Oh, and this is, I mean, an interesting provision in terms of understanding who monitors are. I think it's an 1881B. Contracted monitors, you know, that provision is principally in subsection C, giving them workers' compensation as if they were federal employees, but the same language is there about who are contracted for, and it refers not only to the MSA, but also to the Marine Mammal Protection Act, because observers in fisheries aren't there just under the MSA, but otherwise. I mean, again, I think the most common sense reading is that it's referring to the foreign fishing supplemental observer program where there's direct contracting, but you could also imagine other situations where observers are serving a dual function and are contracted under other statutes, and I think there's also something. Under those other statutes, if it's contracted under another statute, who pays? I don't know the specifics of how the Marine Mammal Protection Act works, Your Honor, so there might be industry funding there. I'm not certain whether there is or not. But I also think, you know, contract could be, and we suggested this in our briefing, and I think this is more of a backup argument than the principal one about the reference to 1821 and the supplemental observer coverage. But, you know, contract, you could imagine in a lap or in one of the North Pacific fisheries where a fisheries research plan is authorized, or even it could be structured like 1821 where even though the funding is through fees or coming from the government, the mechanics for how the observer is supposed to, you know, which provider you're using and, you know, the mechanics of getting to the boat could be done in some sort of contractual way but the payment is coming from the government. So I just think it's a lot to read into. I mean, Biden v. Nebraska, let's use Justice Gorsuch's language. I mean, these seem like really thin reads on which to find in two penalty provisions that are part of two very long sections about, you know, fines and penalties to read authorization for industry funding there where you can't find it anywhere else in the statute. Right. I mean, it depends on how strong you think the indication is otherwise that the observers have to be paid for by the government. And I think both sides have provisions that they point to that say, look, the best way to understand that provision is assuming a world in which the observers are paid by, you would say, the government would say the opposite. Yeah, I mean, again, 1996 we put this in. We've already had direct contracting under the supplemental program in the foreign fishery for years. I mean, that seems like that's the cross-reference. Yeah, although then they could have cited that provision. That would have been easy. Except that 1857 and 1858 are the penalty sections, right? I mean, it makes more sense for a civil... No, I'm just saying in 1858 and 1857 they could have cited 1821 if that's what they really meant to talk about. Well, it was the only thing that existed at the time, right? Right, then it would have been especially easy to cite it because it was the only thing that existed at the time. I mean, possibly. Yeah. You quote our court's line in Maine Lobster Nims about delegating the power to destroy. I mean, can you talk a little bit about whether the fees here, the costs here would be destructive? I can, but Your Honor, I'd like to preface my comment on that by that the amount of the cost I don't think ultimately matters. I mean, the government has tried to suggest that our discussion of cost, that we're trying to mask an arbitrary and capricious challenge of legal meaning, and I don't think that that's true. I mean, it could be that the monitor costs very little, right? It's just the nature of what the monitor is doing means that his salary belongs properly to the government, rather. But, I mean, I think the government's own estimates are that these costs would be tremendous. A 20% reduction in annual returns to owner is definitely not insignificant in the public comments. There's a reason why 96%, I believe it was, of stakeholders of fishermen commented negatively. So, I mean... I just want to be clear. I read your current comment to say that the amount of cost doesn't really matter, that you're arguing what I'll call a principle here, that either Congress has said it explicitly or it hasn't. And if it hasn't said it explicitly, it can't do it. Well, it matters in a real way in that, you know, if the fishermen have to pay it, I mean, that's going to be tremendously difficult. No, what I'm getting at, if we're talking about major corporate fishery operators, that we're not talking about John Jones and his little boat with four fishermen, that's a different picture. All right? Just like we don't have family farms anymore. So, when you tell me that the amount of cost doesn't matter, that says to me that there's something else going on here that has nothing to do with the $700 a day that your clients have to pay in connection with the monitor. I mean, that's a shift in gears, and I'm surprised, but you've done it, so fine. Nothing wrong if that's the way you choose to argue the case. I mean, our clients are not major corporate fishing firms. There are really no major corporate fishing firms in the United States anymore. We don't know because we don't have the record. Who are your clients? Our clients are small family-owned fishermen from Cape May. I mean, one of our clients has one boat that he uses for commercial fishing. He had to sell his second, him and his family, a couple of years back because of the cost. Well, let's just get out of the record here because we don't know. And I thought your point was, regardless, your clients shouldn't have to pay over $700 a day. Because Congress has not required your clients to pay for monitors. End of discussion. Well, that's true. I mean, that's true. I don't think that that's changed. I mean, my point was that to the extent that government- No, I'm not suggesting that hasn't changed. I've understood that to be your argument from the beginning. You started off today saying unless Congress has explicitly provided. Right. I'm sorry, Your Honor. I don't- In your defense, you were just answering my question. And I take Judge Rogers' point that perhaps my question is not relevant. We can decide later whether it's relevant or your answer is relevant. My question was simply, who are your clients? Yeah, our clients are, I mean, they're family-owned fishermen from southern New Jersey. I mean, I would say that the administrative record is replete with the government's own discussion of how there are no major corporate fishermen in the herring fishery and that this is going to have a significant economic impact. My point only about that the cost doesn't matter. It's not that it doesn't matter because in terms of real-life implications of the rules standing, all of that hasn't changed. It's that to the extent the government is trying to suggest that an emphasis on the economic- the adverse economic impact is properly raised under an arbitrary and capricious claim or a claim about noncompliance with National Standards 7 and 8, that because those claims were brought, we didn't appeal them. What work do you think that the Necessary and Appropriate Clause does do? So, well, I can give you an example of something that I think is- if it would be helpful, of a necessary and appropriate provision related to monitoring that is totally authorized and makes sense. And that would be something like a prioritization scheme like what we actually have in the Omnibus Amendment. So, in a world of limited appropriated monies, the agency wants to have monitoring in lots of fisheries, but it can only afford to pay for so many of them before the pot runs out. Having a regulation that sets out how each fishery is going to be prioritized for the placement of a federally funded monitor, much like exists with the standardized bycatch reporting methodology, which is another observing program that the government funds entirely. That sort of thing makes sense. And it's the sort of thing that is necessary and appropriate for the proper implementation of BH's authority for the carrying of an observer. I think that the industry funding requirement falls outside of the boundaries of the legal meaning of appropriate here. And I think that the reason why- I mean, we have to look- Realtors, Association of Realtors, where there's this principle that you have to read things in context. But the court's decision this term, this past term in Harrington versus Purdue Pharma is very instructive because it's exactly the same structure of 1853 where you have a list of what a bankruptcy judge can include in a bankruptcy plan and then he can also include, much like the A and B of 1853, what must and can be included in a fishery management plan and then anything else that's necessary and appropriate. And in fact, the language I think is the same in both the bankruptcy provision and here. And the Supreme Court said when you are faced with that sort of catch-all provision, the way to properly interpret it is to look at the context and look at the nature of the powers that precede it and draw meaning from the surrounding provisions and read it in a way that limits rather than expands the authority of the agency. A catch-all provision isn't meant to be a blank check. Can I ask, I don't know if it has to be under the catch-all provision or somewhere else, but suppose we're talking about monitoring equipment as opposed to, machine monitors as opposed to human monitors. And it's machine monitors that the government has. The government has its own monitors, but it wants them to be on all the owner-operator vessels because they've done the studies, this is the only equipment that works, the only equipment we trust. And let's suppose that that all gets past an arbitrary capricious challenge and that it's what the government wants to do is to require the vessels to use the government equipment to monitor and then the government exacts a charge for that, you know, to use our equipment. Here's the cost and you've got to pay for that. Is that okay? I mean, I'd have to go back through 1853 and find the relevant provision, which I'm pretty sure addresses the use of, it might just be VMS instead of electronic monitoring. I'd have to think about that a bit more. I would just add that there's, I mean, it wouldn't just be arbitrary and capricious that you would have to get over at that point. It might also be Fourth Amendment concerns. And, like, if you look at a case like the Mexican Gulf Fishing Company, which we saw from the Fifth Circuit. That was in a very different context, wasn't it? That's the Fifth Circuit case you're referring to? Yes, ma'am. Yeah, and that was boats that are hired by private. That's right. To go fishing on. So it's not our case, okay? No, no. And the Fifth Circuit didn't suggest it was saying anything in the context of our case. No, I just meant to, Your Honor, I just meant to suggest that it wouldn't just be arbitrary. In the hypothetical of a put this government camera on your boat and pay for it, it wouldn't just be arbitrary and capricious review that you'd have to get past. I believe there probably would be Fourth Amendment concerns. I'm just assuming that it gets by everything else. I guess all I'm trying to isolate is the payment part of it. If it's government monitoring equipment as opposed to a government machine monitor as opposed to a government human monitor, and the government says you need to use our government machine to monitor and you need to pay for that because there's a cost associated with it. I think there might be a meaningful difference between an instance where it's government cameras and a command to purchase your own camera. There might be an important distinction there. It may be the case that the government can't. In that situation, the best way to read the statute is that if it's government equipment that the vessel operator has to use that the government can't pay for it. The government can't require the operator to pay for it. Possibly. It would depend on what part of 1853 the council and the government, the secretary are trying to place that sort of. I don't mean to evade your question. You shouldn't be expected to have an answer at the ready because I'm making up the question. It wouldn't be under V4 because V4 says we can require to use equipment. We can't buy equipment and use vessels and the equipment that's being required to be used happens to be equipment that the government has in its possession. You might then need to distinguish between the requirement to put it on your boat and the requirement to pay for it. If you're trying to say it's under V4 to require the use of. That's what happens when you buy it from a private. If you go to Home Depot and you buy a piece of equipment, it ends up on your boat. I'm just saying instead of going to Home Depot, you're going to the government depot. The government is saying you've got to come to my depot because I don't trust what Home Depot has. I don't mean to belittle what this entails. I'm just trying to make it as easy to understand as possible. You've got to come to our store, buy our stuff, put it on your boat and you need to pay us for it. Yeah. I mean, there might be more that language of require the use of does a bit more legwork, I think, than carry in V8. I mean, it is interesting that we sort of overlook the whole notion of the government's finding about how in fact having monitors enhances the fishermen's ability to profit. All right. So, and of course, it protects other fishermen, Joe Jones and his son who own a boat, who are fishing for a different type species of fish. But, I mean, that's why I'm concerned about the financial end of this in terms of this enables you to get the government seal of good approval so your clients can sell their fish, sell more fish than they otherwise would. So, I mean, that's part of the record in the case so that in answering the Chief Judge's questions, don't you have to take that into account as well? Well, there can be very many commendable things that a regulatory agency hopes to achieve through regulation. I don't think that that means they can just go ahead and do it. So, I'm reminded of a line a few weeks ago, it might have been at the end of August, Judge Rao in one of the first post-Loper cases, Pacific Gas and Electric versus FERC, where she talks about how policy can't trump statutory text, right? That just because it would be great for the fishermen and for the fishery if we had these monitors, that doesn't mean the agency can just do what it wants. I think where it fits in potentially is that I think the part of what I find potentially meritorious about your position is that there's a difference between the observers and equipment because the observers are government observers and the government would usually pay for that and the natural understanding of that would be that the government should continue to pay for it and you can't flip the costs over. Whereas with equipment, actually the vessel owner goes out and gets a piece of equipment and that piece of equipment benefits the vessel owner. And it's also his. It's his, right? And presumably the reason he has it is because it serves some purpose. And so I think what Judge Rogers could be getting to is, well, the observers serve a purpose too that's beneficial to the vessel operators based on some of the stuff that's in the briefing because the monitoring function is actually beneficial.  I mean, so the exact line that I was thinking of is policy concerns cannot override the text of a statutory provision and then there's a site to utility air regulatory group from the Supreme Court. So, I mean, yes, it could be that monitors are the best thing for everybody. Certainly the government seems to think that there's added value to having increased monitoring. Certainly the record also reflects that some fishermen disagree with that. But even if we, for the sake of argument, say that it'd be great to have lots of observers on even more trips than 50 percent, that doesn't mean the agency can do it because it would be beneficial even for the fishermen. They have to follow the law. And the policy concern doesn't cover that. How about beneficial to the general public who wants to eat fish? I mean, that's the other side of the health side. I don't want to pursue that, but in any event, I appreciate your comment. And I was thinking presumably your response would be the same even if you were in a position where your clients were forced to buy the machine and you were just renting it for whatever period the government wanted to cover and get the test results. And presumably you wouldn't object to the maintenance of the equipment being paid for by your clients, but I don't know. Unless your honors have any other questions, I'm happy to come back for rebuttal. Sure. Thank you. Thank you, counsel. We can hear from the government now. Good afternoon, your honors. May it please the court. Daniel Holine for the government. We think the Magnuson-Stevens Act is best read to authorize industry-funded monitoring in the Atlantic Carrying Fishery because Congress authorized the National Marine Fishery Service to implement observer programs for the benefit of the fishery writ large. And that sometimes requires industry vessels that carry observers to bear the cost of complying with that requirement. This court previously concluded that the agency exercised lawful statutory authority to adopt this rule, and although the Supreme Court has overruled Chevron, we think that the same result obtains, notwithstanding the change in interpretive methodology, because the statute is best read to authorize this type of rule in Section 1853B8. We think that the plaintiff's arguments on remand from the Supreme Court are essentially asking the court to depart from or reject some of its earlier analysis of the statute. We think that's unnecessary where the Supreme Court didn't reach any of these statutory issues and didn't disturb any of the court's conclusions about the proper construction of the statute. Mr. Mulvay gives an example of something he thinks the necessary and appropriate clause would allow the agency to do. Can you think of an example of something that it does not allow the agency to do? Sure. I think the necessary and appropriate clause in 1853B14 also has additional language. It says it has to be necessary and appropriate for conservation and management purposes. I would suggest that the example that you cited in your earlier sent about driving around employees would not fit within conservation and management purposes. I think there is... And that's because it wouldn't help conservation? Because there's not a close enough tie to the conservation and management purposes as that term is defined in Section 1802, Subsection 5 of the statute, which is concerned with things like maintaining a supply of food and ensuring continued recreational benefits in the fishery, avoiding adverse impacts to affected communities, et cetera. What if the agency decided to outsource its annual catch limit decisions? I take it that the fisheries or the council that then goes to the fisheries, somebody in this operation puts catch limits, establishes catch limits. Am I right so far? The secretary of the council. Okay. And then what if the agency were to say, well, we're going to have a third party establish the catch limits and we're going to make the fishermen pay the third party's salaries. Would that be okay? I don't think so. I think the issue there would both be with the secretary exercising, through the National Marine Fisheries Service, obligations that the government official is charged with, and also with establishing the necessary sort of reasonable connection to the statutory purpose. And this is where I think we get into the distinctions between statutory authority questions and reasonableness questions. I think a lot of the sort of questions at the outer bounds of statutory authority would necessarily be constrained by other limits within the statute, including the APA's Section 706 scope of review, but also the national standards in Section 1851 of the statute. I understand the first part, that it may just be that the statute doesn't allow the decision to be outsourced. But we could easily change the hypothetical so that we imagine a statutory provision that allows the decision to be outsourced and that is silenced on who will pay the salaries of the contractors. The second part, though, I'm not sure why that would be far removed from the – why the hypothetical is far removed from the purpose, because the purpose of the catch limit is conservation, I think, and in my hypothetical, the contractors setting the catch limits would be serving the purpose of conservation. I guess I'm struggling a little bit with the hypothetical because I imagine there would be a host of independent constraints that would prevent us from ever getting into this territory. But I think just as a matter of necessary and appropriate authority, it doesn't seem to me that that's a faithful implementation of the conservation and management purposes of the statute by outsourcing. Why is catch limit not consistent with the purpose of conservation and management but monitoring is consistent with the purpose of conservation and management? I think catch limits are certainly part of the conservation and management of the fishery. I'm focusing more on outsourcing that to a third party in the way that you're suggesting, whereas observers, I think— You're saying maybe you can't imagine why. Maybe they just don't have the money to pay their own staff who sets the catch limits. I assume it takes some research and some work. And so imagine there is a statutory provision that allows the outsourcing, silent on who will pay the outsourced contractors, but it allows the outsourcing. So you're suggesting something comparable to Section 1853B8, specifically providing for catch limits to be set by third parties? Yes. I think in that circumstance, it's plausible that the necessary and appropriate authority would reach that. But I think as this Court explained in its earlier decision, when you're looking at these types of provisions like necessary and appropriate, consistent with what the Supreme Court said in its decision explaining how these types of provisions should be considered going forward, you have to look at the agency operating within its lane of regulatory authority. And so here we're tightly focused on Section 1853B8 is expressly authorizing observer programs and observer requirements. And the exercise of Section 1853B14, necessary and appropriate authority, would be in fulfillment of that sort of statutory authority. Whereas if there was some sort of freewheeling, untethered policy that is not sufficiently within the regulatory lane, I think that would create issues. I appreciate that, but if I'm hearing, if I'm understanding correctly, first we have to make sure that a statute allows a third party to be involved at all. Here, of course, VA allows third party monitors to be carried on the ships. And then we would have to say, okay, if the agency is doing something related, issuing a rule related to that, then we have to make sure that the rule is connected to the purpose of conservation and management in order to be necessary and appropriate. But once that box is checked, I'm not sure I'm seeing much more of a limit from you. So I do think that necessary and appropriate is broad language. You know, the Supreme Court specifically cited the language from Michigan against EPA that this Court recited in its earlier decision about conferring flexibility on agencies. I think the specific language in the Supreme Court decision is about regulating subject to the limits of a flexible term. And I think the implication of what the Supreme Court said is that that is properly interpreted. The best meaning of those types of provisions is conferring a degree of discretion on the agency.  Can I ask about one of Mr. Mulday's hypotheticals? I'm not sure he mentions a hypothetical, but he mentioned air marshals. You know, kind of imagine that there's a necessary and appropriate clause in the statutes that require the airlines to carry air marshals. Do you think that that kind of catch-all provision would allow an agency with congressional silence to force the airlines to pay the salaries of the air marshals? It sounds to me based on sort of this framing that it wouldn't. That it would not? That it would not. And that's because? I think there are a couple of distinctions from this type of provision. One is that that's clearly a government employee. We have here a determination below that these observers are not government employees. That wasn't challenged on appeal. And I think, you know, in the context of this hypothetical, there doesn't seem to be other textual evidence to support that there's authority to exercise necessary and appropriate authority in this way. Whereas here we have a host of statutory provisions that support the agency's exercise of this authority. Let me try one more. So imagine that there's a statutory provision that allows the IRS to use independent contractors to audit taxpayers. That's the statutory. I don't know what it is. Probably. I don't know who that is. Imagine that's the world. And then there's a necessary and appropriate clause. So the statute says taxpayers must make their financial information available to third-party auditors who will report to the IRS. But they're not IRS employees. They're contractors. And also the IRS can issue regulations that are necessary and appropriate for the purpose of making sure people pay the right amount of tax. In that situation, do you think that the IRS could require the taxpayer to pay the salary of the third-party auditor? It sounds to me like probably not based off of the way the statute is phrased where it's making information available to a third-party. Here there's just a requirement to carry an observer. So I think that the sort of language that the statute uses is important in sort of understanding where the necessary and appropriate type of authority comes into play because it has to be within that general language. I appreciate it. To me, a lot of this turns on whether there's something inherent in what the observers are doing that makes them inherently governmental or is it more in the realm of stuff like equipment that we wouldn't say is inherently something that the government would otherwise be doing and therefore the government would pay for. And so in the air marshals hypothetical, I'm not even sure necessary and appropriate is honestly doing a ton of work in my mind because it has to be both necessary and appropriate. And appropriate, it just means it's capacious but it's going to be inappropriate if it's something that seems intensely governmental and the government ought to be in all expectations would be providing for it. And it is going to be appropriate if it's the type of thing that we ordinarily think, no, it's not so intensely governmental that the government has to pay for. We can imagine a world in which the regulated entity would pay for it too. So with air marshals, with air equipment, I would imagine that the FAA, whoever it is, can require airlines to have certain equipment on board to deal with safety issues. And it doesn't seem inappropriate if we just carry out the comparison to say that the airline operators would pay for that. It does seem, though, kind of inappropriate to say these are federal air marshals and you have to carry them on board and then you also have to pay their salary while they're on board. That just doesn't seem like the type of thing that we'd ordinarily think would be contemplated, unless there were some other indication of the statute that that's to be provided for. So what's going to help me meet out whether these observers are in the nature of, even if they're not technically government employees, that they're in the nature of government employees that you would just expect, they're performing governmental functions, they're doing governmental stuff on a day-to-day basis, the government's getting the benefit of this. So the government ought to be paying for it. And as opposed to equipment under B-4, which I think I share your view, and I don't hear the other side to be objecting to this, that for equipment under B-4, even if it's monitoring equipment as opposed to machine monitors as opposed to human monitors, it doesn't seem inappropriate to require the vessel operators to pay for that. What's the best stuff I can grasp onto to understand why the observers aren't in the nature of government employees that you'd expect the government to pay for and are more in the nature of monitoring equipment as to which you'd expect the vessel operators here to pay for? I think I'm getting across hopefully what I'm trying to get across. So I think the appropriate way to think about observers is not as inspectors or law enforcement officers because they're not fulfilling a sort of government enforcement function, but rather collecting scientific data on the vessel to provide for the benefit of the fishery as a whole, including the fishing industry itself. So it is, of course, true, I think, as you're getting it, that this information is coming to the government for use in conservation management. It's consistent with, for example, in Section 1853A-5, I believe it is, authority that Congress put into the statute where the service can require vessels themselves to submit data to the government for use in conservation and management. So this is similarly structured such that the observers are providing data about the fishery to the government to use for the benefit of the fishing industry generally and the fishery as a whole. And so I think that's the distinction between something like an air marshal, which is clearly a governmental function in terms of law enforcement or inspection or something like that, whereas this is essentially a scientific role in collecting data, which is not necessarily governmental. It's simply, you know, on the fishing vessel, this is a specialized person that provides the data that everybody needs so that we all know what's going on in the fishery and can implement appropriate conservation and management. And what is the payment? To pay for the observers, what are we talking about? How do these contracts usually work? Is it a contract for the time that you're on the vessel and it's like by the hour or something, or how does it work? I believe a contract for the trip. I'm not sure if the rate is calculated hourly or not. I apologize. The contract is sort of negotiated directly between the vessel and the observer services provider. Of course, the government certifies the observer service provider, trains the observer, so it's not like we're wholly distant from this, but that is a relationship directly between the observer services provider and the vessel itself. Has that been true so far as you know since the statute was enacted and even amended when the government was paying? So when the government pays for the observers, like, for example, in the SBRM program, often the government itself is providing the observer or it can contract with an observer services provider. Historically, for example, we talk about the North Pacific program that was implemented before the 1990 amendments that adopted 1853b8. That was a situation where they were, under the regulation, having the vessel contract directly with the observer to provide the service. And what is the government's relationship with the observers when they're under the penalty provision when contracted, whatever the language of that provision says, contracted by observer services, contracted by an owner or operator? So in that situation where you have observer services that are contracted by an owner or operator, what is the government's role and interactions with the observers who are providing those observer services that are contracted by an owner or operator? So the government trains the observers and provides necessary, performs necessary functions to ensure that the scientific data is, like, usable for conservation and management purposes. The contract itself is directly with the vessel, though. So in terms of that relationship, that is direct. And the sanction is just to ensure that the vessel, you know, is not reneging on requirements under their own contracts to provide for the observer services. And when you say they provide the training and providing the license services, is that directly with a company that has these observers as folks that are in their employee and that will be contracted out by a vessel operator? Correct. There are special observer services providers that are certified by the government. It's just a handful of companies that provide this, and then New England Fisheries that we're talking about here, and they employ the services and then contract them out for the observer services on the vessel. And is that the only purpose for which these observers exist? To collect information for. So observers sometimes provide information under different statutory programs. So, for example, we have a separate standardized bycatch report at the SBRM that's talked about in the briefing. And so sometimes they're, you know, collecting data for more than one purpose. But the observer is essentially functioning just to collect data and information and further and so the Magnuson-Stevens Act. And that brings to my mind another question that's somewhat related, which is that in answer to the question about what work the contracted by language could be doing in the penalty provision, Mr. Mulvey mentioned that you have the foreign vessels part. So that's one place in which they could be contracted by. And there's also some other statutes in which there's provisions for contract services for observers. In those other statutes, are those situations in which the operator pays for the observers or are those situations in which the government pays for the observers? So I'd like to come back to the foreign fishing, but first to directly answer this. I think, you know, because of the nature of the argumentation, I'm not sure exactly which programs we're talking about. There are several statutory schemes that provide for observers. There are Endangered Species Act observers, Marine Mammal Protection Act observers, et cetera. And I think the main point that we've raised with respect to those statutes is that they are similarly structured without this kind of language about, you know, directly addressing a supposed requirement that Congress spell out, you know, that they have to bear the compliance costs. I can't speak to any particular program just because I'm not sure which ones we're talking about. Going back to the foreign fishing. No, no, but before you go back to that, but in those situations under the Endangered Species Act or whatever, are those situations in which the observers are paid for by the government or are they paid for by whoever is required to have the observers, or is there at least some situations in which they're not paid for by the government? I'm not sure exactly the answer to that question, Your Honor. There are a variety of different observer programs. So I can't think of one that would provide an adequate account of what this language is doing in the statute that would be authorized by a statutory program that meets the sort of requirements of plaintiff's arguments, but I don't have an answer to your question. What do you think contracted by, and then I'll in part let you get to your answer on the foreign vessel operators, but what do you think contracted by an owner or operator is referring to? It's referring at least in part to the foreign vessels. I don't think it's referring to the foreign vessels in particular. I think it's referring to general authority under marine resources laws like the ones that we're talking about and including 1853 to adopt observer requirements that may require under some circumstances the vessel to directly contract for observer services to comply with an observer requirement where it's not provided by the government. Okay, now 1821. So I don't think 1821, and this is 1821H6, the supplementary observer program, is an adequate account of what that language is doing in 1858 for a couple reasons. First, I think if you look at 1858 itself, it says under any marine resource law, so it's clearly not referring specifically to the foreign fishing program. Second, just as a historical matter, Congress enacted the Magnuson-Stevens Act in 1976 to address foreign fishing specifically, but by around 1990, and I think the amicus brief from the conservation groups is helpful on this point, but around 1990, foreign fishing was largely displaced by domestic fishing, which is why we suddenly saw domestic observer programs because we needed information about the fisheries and that was no longer coming from foreign fishing vessels. And the 1858 G1D was added in 1996, so it's just a bit historically odd to think about it that way. And then the last part is that 1858 G1D is essentially just a supplemental provision of a fee program. The fees are not – the fee program that is housed primarily in 1821 H4, I apologize, is a situation where the fees take the government, as we've sort of argued generally about these fee programs. H6 is just sort of a residual clause where when the government doesn't have enough money to administer that program, the money is paid directly to the observer on a schedule of fees is the language that Congress used. So it's clearly thinking about this in the context of a fee program, and so it doesn't make sense for that to be why Congress in 1996 adopted 1858. So then do you think that 1858, because of this point you made about fees, that G1D isn't dealing with 1821 at all? Or is it just that it is dealing with 1821, but it's not limited to that? I don't think so. You don't think so, which? I don't think it's dealing with 1821 at all, because 1821 H4, H1, H4, the sort of main fee program involves a fee payment to the government to provide U.S. observers, is the language used in the statute, U.S. observers that are placed onto foreign vessels. Foreign fishing is just an entirely different context essentially from domestic fishing, and so the only way that this sort of contractual thing is plausibly raised is through that supplementary H6 program, which for the reasons I outlined I don't think makes sense. Those do involve contracts. Those involved, what Congress said is a schedule of fees paid directly to the observer. Again, this hasn't happened, so it's sort of like hypothetically talking about what the statute means in the abstract. But that's how it's referred to, it's a schedule of fees rather than contracting. I think it's plausible maybe that could be carried out through contracting, but I think it's just an odd way to account for what 1858 is doing. Can I ask you the same Air Marshal's hypothetical, but the statute says they're private contractors. Do you give the same answer in that situation? They're private contractors that are typically employed by the government. It's like instead of Air Marshals who work for the government, they're private contractors, the government pays them as a government contractor. That's in the statute. And so the obligation would be on the hypothesis. I mean the airlines are obligated under the statute to carry the Air Marshals, and then let's say there's a necessary and appropriate catch-all provision, and then the government agency comes along and says, airlines, we want you to pay the salaries of the Air Marshals. Would that be allowed? I think that's more plausible, but I think going back to the idea that there's something, there are outer bounds to necessary and appropriate, and that sounds like a circumstance where the appropriate function might be doing some work, as we were discussing earlier. Not very much work if it's allowable. I think it's plausible that it would be permissible. I just think it's hard to talk about in the abstract because I imagine there would be lots of other independent constraints, and you'd have to look at the rules. I understand that. And then you mentioned the monitors are not really there for enforcement. They serve more of a scientific role. I guess I thought one of the purposes of the monitors was to see if the fishermen in the particular boat are catching more fish than they're allowed to catch, and if so, to tell the government that so that an enforcement action might be brought. Am I wrong about that? They submit data to the government, and the government can take enforcement action, but they're not serving an enforcement function. So I get they serve a scientific purpose, but it sounds like their purpose has quite a lot to do with enforcing laws about fishing. I don't think that's generally the case. They're providing information about sort of the nature of the catch and by catch, the species that are being caught, and essentially providing information that's used for purposes of stock assessments, annual catch limit, things like that. It's not an enforcement function. Does it ever lead to enforcement proceedings? I honestly can't think of a situation. I don't want to say that it hasn't happened, but I'm not aware specifically of a circumstance where an observer report led to an enforcement action. But, again, I don't want to put those numbers. I think in the Supreme Court Loper Brite, there were something like 50, 60-plus amicus briefs. Do you know if any of those amicus briefs were filed by fishermen in support of the government? None are coming. You would kind of expect it, right? If these monitors are such a great thing for fishermen and they're really like the fisherman's best friend, you'd think there'd be fishermen who couldn't just wait to tell the Supreme Court to save this program. Well, generally there's just a lot of amicus briefs, so it's a bit difficult to remember. I can check and find out. But do you agree with the principle that if there weren't a lot of fishermen saying, we love this program, maybe that's a sign the fishermen don't love this program? Well, I do want to be clear that this is a very small program. There's only about 40 vessels with the relevant permits at the time that the rule was adopted. So this affects a very small corner. I thought the same, like we're going to make you pay for your monitors, regulation had been used for other fishermen? It has been, yes. They might have wanted to save the program if they liked it a lot also, right? Sure. So I think another thing that I would just point out on this point is that, you know, the information that observers provide I think is really important to the statutory scheme. Congress made a big deal about this in Section 1801. And, you know, as I was saying, Section 1853A5 provides for the submission of data. There's information about, you know, rules about using the best scientific data. And that's because it's important for the agency to have a sufficient understanding of what's going on in the fishery so that it can increase the accuracy of its data and avoid, you know, more conservative regulation than is necessary, right? Because if we don't understand what's going on in the fishery, we may need to take actions like, you know, limiting access to the fishery, fishery closures, things like that. So this is to the benefit of the industry. I mean, I definitely understand how it could be to the benefit of, as Judge Rogers said, the people eating fish and it could be sort of a conservation goal. And I don't doubt that maybe it has some benefit to the industry, but it sounds like you're trying to convince us that the benefits to the industry vastly outweigh the costs to the industry. The benefits to the individual fishermen on these little boats that go out and, you know, scrap, you know, scrape out a living. It sounds like your point is, like, the benefits to them are so much greater than the costs. And I don't think you have to make that argument to win your case, but it seems like a heavy lift. I don't think that that's exactly the point that I'm trying to get at. I think it's important to just understand that this is not an enforcement program. This is for the benefit of the fishery. And part of what Congress was getting at in things like National Standard 1 is ensuring, is directing the agency to, you know, one of the considerations is achieving optimum yield. So taking into account the need to balance these various factors, like the benefits of the observer data with the costs to industry. And so I think that's the point that I'm getting at, is that the observers perform an important function. And to the extent there is weighing of benefits and costs, that is certainly something that, you know, the agency considers and that the fishermen can challenge our analysis of that. They can say it's arbitrary and capricious. They can say that we haven't complied with the national standards. And I just don't think it goes to the questions of statutory authority. I can shift gears for a second. When it was paused in April of 2023, the government said it has to do with not having funding for the administrative costs to do things like train and certify the observers. Do you know if the agency needed a line item from Congress for this particular cost and Congress didn't do it, or if the agency has money and it decides how to spend that money and it kind of ran out of general funding because it prioritized some things over this thing? So my understanding of the way it works is there are various pools of appropriated funds that various offices within the National Marine Fisheries Service can apply to for funding. And so this would be a circumstance where the New England regional employees from the service would be seeking funding from a limited pool of appropriated funds to use to fund this type of program. Sometimes we're not able to secure that. I did want to just brief. Can I ask you a question? When the statute was originally passed, one of the arguments made by the fishermen is that everyone understood the government was going to pay for the monitors. And, indeed, the government did pay for a number of years for the monitors. While we don't defer to the agency, that is a relevant context. Or is it that once the government ran short of funds because Congress had failed to appropriate them, then in order to continue this operation, which, in your words, is so important to the program for conservation and management, then I don't know if you want to rely on necessary and appropriate, but that I'm trying to get your best response to why isn't that a relevant consideration and why isn't it a very strong indication that Congress did not intend for the private fishermen to pay the cost of monitors, even if they do not have a law enforcement purpose and they're just there to collect the data that the government needs for the reasons that you mentioned? So I think one response to that is that when Congress enacted the authority in Section 1853b-8, the legislative history reflects that Congress is essentially codifying existing authority, which the agency already had used to adopt this type of program in Alaska where the regulated vessels procured an observer at their own expense. So I think that informs kind of what Congress was up to, along with the other evidence that we've cited about how in the ground fish program, Congress issued appropriations instructions about refunding industry costs, and that suggests that Congress is aware. Congress can exercise options like withholding funds from implementing agency programs if it thinks that they're improper or inconsistent with Congress's intent and statute, but Congress hasn't done that. Congress is aware of these programs and they continue to proceed. Well, what I'm getting at in part is as Congress has added to the responsibilities of the federal agencies, it has not always provided the additional funding for the agency to maintain its then current staffing or administrative costs, much less added the staffing and funding that the agency has said are necessary in order to carry out these new responsibilities. So here, I mean, the fisherman makes the point that nobody objected to this monitoring requirement because everybody who would be affected understood that the government was going to pay for the monitoring and they would have to provide, you know, bunk and board and that they would have to purchase certain equipment that the government required under the council's plan for the region. So the court, I'm going to put words in your mouth to tell me why it's inappropriate to do this. I understand your point about we had this Alaska program. So when Congress acted, everyone should have been on notice that it would be possible that industry would have to pay. But then for a number of years, that possibility never arose and it was a fairly substantial period of time. And then these emails come from the agency saying to the fisherman, you pay this year. So I think in the context of this program, the regulation was promulgated in 2020, so the responsibility to comply with it followed closely on the actual promulgation of the rule. This didn't come out of nowhere. This was subject to notice and comment. People weighed in. We implement these programs through bulletins and closures and things like that. So I think even if the agency doesn't exercise authority that it has been conferred as it was in the 1990 statute, that doesn't mean it lacked that authority. It simply means it didn't find it necessary and appropriate to use it or that it didn't have a reason to under Section 1853BA to meet the information purposes of the Magnuson-Stevens Act. Do you know from your review of the record whether this issue of industry payment came up during the notice and comment period? In this rule, it did, yes. And while we're on the subject of sort of the agency's implementation, I just wanted to speak briefly to the nature of our bulletin about sort of what's going on with the program and the reimbursement in particular. What happened with reimbursement is that it was for Etsy monitoring. It wasn't just for portside sampling and electronic monitoring. About $30,000 of industry costs were incurred during the period when the program was in operation and it had sufficient funds to reimburse that. So that did include Etsy monitoring of the type that we're talking about here. And I think it's a useful data point when we're considering the sort of costs of the program. This was, you know, in effect for the 2021-2022 seasons. It was, you know, a total of less than $30,000 of industry costs. Less than how much? Less than $30,000. We reimbursed $8,591 in 2021 and $21,743 in 2022. Industry-wide? For that herring fishery. And that includes things besides Etsy monitoring, including electronic monitoring of portside sampling. Let me just ask you about that. I misspoke in asking you the question. What I was getting at was when the act was passed and then amended initially, was there any reference to industry payment? I understand it came up when the rules, and that's when all the fishermen came and submitted negative comments. But prior to that, I thought I understood you to say that, you know, the act and the amendment were adopted in light of the Alaska program where industry was paying. So everyone was, as it were, on notice. But there was no record of opposition. And the fishermen argued that, well, that's because everybody thought the government was going to pay. And that's what happened for a long time. So it wasn't until the notice and comment on the rule that the industry realized that the government was proposing to have them pay for the monitors. That's what I was trying to get at. Before that rulemaking, was there any notice other than the notice that you say, and I'm not suggesting you're not reporting accurately, but that when Congress amended the statute, it was essentially following what was going on in the Alaska program? Sure. So I would point to two things. So in the 1990 legislative history, that's where we cite some of the testimony acknowledging that this was the current status quo in the Alaska fishery. The 1990 statute, the amendments, also adopted the North Pacific Observer Program, which sort of displaced this type of model by adopting a fee program, which as we've explained, we think is distinct. So that kind of, I think, addressed why there was like a shift in perspective, is because in that particular fishery, Congress had decided to authorize a different type of funding structure through a fee program. But that fishery had industry payment at that time? It's just that it shifted to a fee structure of industry payment? Yes, there was an Alaska-specific. That's the Alaska one? Yes, the Alaska Pacific, yes. And then in terms of before this rulemaking, I think there was some reference to the gateful litigation in this northeastern region. We also had a Northeast Multispecies Observer Program that was challenged in litigation. So I think this is not the first time that the industry has become aware of this issue. That was during the legislative history for the statute? No, no. In terms of just events that occurred before this rulemaking. Yes, but I think Judge Rogers was asking about the statute and the debate surrounding the statute. Right, yes. And as I understand it, the statute provided for industry funding for North Pacific slash Alaska, right? The industry was silent about the fishery here, right? And almost all fisheries, it was silent about industry funding, right? In the 1990 statute, correct. Right, and in the legislative history and debate about the 1990 amendments, there was no mention of industry funding outside of North Pacific and maybe foreign and limited catch. Is that right? The legislative history is silent about what you think the statute authorized, correct? I think the legislative history is not silent insofar as 1990 was when Congress adopted Section 1853B and said it was codifying existing authority. So what does existing authority mean? It means what was going on already, which was the Alaska program that involved this type of direct contracting structure. But I still think that was a yes, aside from just take Alaska out of it. And the reason I say that is because there's this express statutory authorization in the amendment for industry-funded monitoring in Alaska. So imagine Alaska doesn't exist. Was there anything in the legislative history about industry funding of monitors? For purposes of Section 1853B-8, I think beyond what I cited, I don't have anything else to say. Okay, and then the statute itself is silent about whether B-8 allows industry funding. You take from that silence an implication that the agency has authority. The appellants draw the opposite inference. Actually, they say maybe silence is never good enough. I think sometimes silence, by the way, is probably good enough. You can have express authorization for agency or implications from express text. But absent some reason to think that the express text implies industry funding, you would admit that in that instance silence suggests no agency authority because agencies are creatures of Congress, so they can only do what Congress has either expressly said they can do or implied through text that they can do. I think as a general principle I agree, but I think in this particular context, you look at cases like Brown and Williamson, which talk about how context can inform whether a statutory term is ambiguous, et cetera. So I think here what we've pointed to is provisions like 1858 and all the other provisions that expressly contemplate industry costs involved in complying with measures adopted under Section 1853, none of which specify compliance costs expressly in them. We think that informs how the court should understand Section 1853b8 and whether it speaks to the issue. All right, but I want to be clear about your response because I understood it somewhat differently. I suppose we can check this. When the statute was passed, there had been a program in Alaska where industry was paying. That was the status quo, and the Act decided it wanted not to relieve the Alaska industry of paying the cost, but it wanted a different system for payment, and so the Act included this fee system. Am I correctly hearing you? Yes. The 1990 statute did two things. It adopted 1853b8, which is the general observer program, and Congress understood that it was codifying the status quo. This is my gloss on it, but codifying the status quo in so doing, and separately Congress made a choice to set up a different funding structure in the North Pacific. Thank you. Okay, thank you, counsel. Thank you. Mr. Mulvey, we'll give you three minutes for a rebuttal. Thank you, Your Honor. Two main points. Since we're already talking about the 1990 amendments, I'd like to start there. A posting counsel described the 1990 amendments and 1862 as displacing, to use his word, what came before. I mean, I think that's kind of an amazing concession because it demonstrates... No, he actually said it was endorsing the status quo, and it decided that it simply wanted a different way for industry to pay, that it had been paying before the 1990 amendments. He used the word displaced, and he used it accurately because... Because the amendments said we're displacing the status quo where the industry was paying in a certain way to set up a fee system. Did you not hear him say that? Because that was the whole point of my last question. Your Honor, 1862 is permissive. All right, this is something that was addressed in the principal briefing. 1862 says the North Pacific Council may fund its observing through a system of fees, and yet I think it's accurate, his use of the word displaced, because now the North Pacific, its observing is funded through fees. Right, and that doesn't mean it wasn't paying before. That's all I'm getting at. No, but, Your Honor... And you haven't shown anything to the contrary. Well, I disagree with that, Your Honor. I would say first of all that... What have you shown so I'm clear? In 1862, the 1990 amendments merely codified the status quo. No, no, no. That's not what he said, counsel. I was trying to clarify that point. There had been a system requiring industry to pay for the monitors, all right? Then the amendments came, and it continues to require industry to pay, but the payments would be in accordance with this fee system instead of what had been going on before, and to that extent it replaced the status quo. But I think there's a distinction here. That's all I'm getting at. Not, you know, I mean, this is something we can, you know, verify on the record. It's not a question of argument. What was in the pre-1990 amendment statute as to the Alaska fishermen? The government's contention is that prior to the 1990 amendments, and really this was only for a period of months. It wasn't as if there were a long-established industry funding program in the North Pacific. They didn't say anything about time, counsel. No, but I'm mentioning that as to your point. You were curious about how long-standing the agency's interpretation of its authority was. The government has explained that how it required industry funding in the North Pacific or attempted to require it before the 1990 amendments was by FIAT, simply directing the agencies to do it. If the 1990 amendments that Congress somehow was attempting to codify in statute, the status quo, then the government would not have needed to switch to a fee-based system. No, but it decided the fee system would work better. I mean, it made a judgment about how, as I understand, I'm not trying to argue with you. It's just it decided the fee system would work better. That's the way they wanted to do it, and it wasn't changing the payment obligation. That's all I was getting at. Or it realized that it had no authority otherwise. Could have, but that's not the way counsel presented it. I'm just saying there hadn't been any case law or anything saying you don't have any authority. It's still your argument, as I understand your argument, is that there was no express provision either before or after the 1990 amendments authorizing the agency to require industry to pay for the monitors. Our argument is that the most common sense way to read the 1990 amendments is to see that Congress, when it allowed a general authority for fishery management plans to require the carrying of an observer, was limited only to the carrying of the observer and that its decision to address funding in the North Pacific, the only fishery where there had ever been an attempt only months before the legislation to require industry funding, that its decision to require fees, if the agency understood it at the time that 1862 was about the authority to require industry funding and 1863b-8 had nothing to do with that. Can I just ask about 1862? So under 1862, if the agency decided that it wanted to continue industry funding in Alaska as it was before this statutory amendment, for the few months, I'll take your point. I'll say it was an hour. I don't care. But whatever it was that was going on beforehand, it wants to continue that. And then it reads the statute to say, as you rightly say, it says may. So you may do it through a fee system. And the agency decides, actually, we want to continue industry funding. We don't want to do it through a fee system, though. We want to go back to doing it through a contracting system as before. Does 1862 give the authority to do that? No. 1862 says that, well, let me back up. That would only be if you accept the premise that 1863b-8 requires industry funding by fiat as some sort of compliance. No, no, no. It doesn't require it. It doesn't require it. My point is that the government has argued in its brief that 1862 mandated a particular outcome, but it didn't. It's permissive. I think Judge Walker pointed that out. Honestly, at this point, I don't care what the government has argued. I'm just asking you a question. Yeah. 1862 says that it's permissive in that the North Pacific Council may come up with this fee, impose this fee-based system that is industry funding, right? And that's the way to pay if you want industry funding. So my question is, if the agency wants to continue industry funding but not through the fee system and only under the North Pacific Council and, say, only in the way that it was being done before, does 1862, since it's permissive as to the fee program, does it also permit industry funding through a non-fee program only with respect to the North Pacific Council? I don't think so. Okay. I just wanted to make sure I understood your position on that. No, no, no. But I'm just saying in terms of... Do you think it's fee system or nothing and only for the North Pacific Council? Rent or industry fund. I mean, excuse me, government-funded observers. Yes, of course it's government-funded. Right, right. So the other thing in relation there until I get to the last point is I just want to stress again that from what happened in 1990, we don't see industry funding attempted by the government again in a mandatory way outside of explicit, you know, a lap or something until 2004. Got it. So there's no longstanding... And it's striking that they don't ask for Skidmore-type deference. Can I just ask one last question just as a practical matter?  So I think I know the answer to this, but I just want to make sure this is right. If the world were as you think it is, which is that the statute only allows, apart from these specific provisions, it only allows for monitors if the government pays for it, would your clients still rather have a world in which they didn't have to carry the monitors at all than a world in which they carry the monitors but they're government-funded? Well, at this point in time, I'd have to ask my client what their current views are. I mean, we don't... Go back to another time. Yeah, I mean, previously we haven't challenged the legality of the presence of the monitor. That's not the legality. I'm not even talking about the legality. I'm just talking about what... If you could lobby Congress and you could just get your way, would you rather have a world in which you didn't have monitors at all or a world in which there were monitors but the government was going to pay for the full... I think many fishermen, and this is evident in the public comment period here, but also if you just read anecdotally on the Internet in another forum, at the fish council meetings, many fishermen do not appreciate the presence of a monitor at all. I thought that was your answer, but I just wanted to make sure that... But that actually kind of gets at the last point I wanted to make, and I know you only wanted me to speak for three minutes, but I want to really push back against this idea that the government pushes that the monitors are just like scientists collecting biological data. I think we have a number of examples in our briefing, and also if you look at 50 CFR 64.11, they do a lot more than that. So they have to be on call to go to NOAA Office of Law Enforcement to talk about what they witnessed on the boat. If you look at 64.11D, not only do they have to be let onto the boat, but they get to go on the bridge. They get to go through the communications logs. They get to go through the navigation logs. I mentioned that they need to report safety hazards. They need to report violations of law aside from whatever biological sampling or scientific collection they're doing. I mean, if you look, this is not... You can take notice of it because it's a handbook that's on the agency website, and I hadn't found it before the supplemental reply brief, but NOAA publishes a vessel owner and operator handbook about monitoring, and on page 30, I can file a copy in the docket if you would find it helpful if you can't find it online. It has a chart of what observers are supposed to do on board, and even before it gets to the scientific stuff, they have to do safety checks, talk to all the personnel. They have to collect economic information, including all the information, the data about the cost of the trip, the price of the fuel, how much ice, the cost of the ice, information about the fish dealer they're dealing with, the vessel trip report numbers, all the information about the nets, dredges, mesh sizes, and gear configuration. Okay, so thank you for pointing out to that guidance, and we'll be sure to... Quite a bit. Your Honor, I would... All your Honors, we would ask that you reverse this report. Maybe one and a half questions, but maybe two. So along the lines of what you were just saying, let's say that a monitor is on the ship, and they find that the fish is catching more fish than it's allowed to catch. What happens then? My understanding is that it's in the report that they submit directly to NOAA. Fishermen, as I understand it, don't get copies of this information. It's not theirs. It's government information. It goes to NOAA. NOAA, I suppose it's within its discretion whether it decides to enforce or not, but the observer is on call to be interviewed or to provide further information. And NOAA could enforce? If there's a violation of the rules of the fishery, I would imagine so. And the monitor would possibly be a witness in that enforcement action. That's what I would understand by the being on call. And then last thing, the government mentioned... Counsel, could I, Judge Walker, just ask? My understanding of the record here was that the owner of the vessel has records as to, I don't know the technical term, how many pounds of herring it's catching, how many byproducts there are. So this is not secret information. And before the monitors, the boat owners collected this information. If for no other reason, so they could sell it per pound. So the vessel owners and operators do have their own information that they still compile and report, which is in some cases duplicative of what the observer is collecting. That's my point. That's my point only. We're not talking about the observers doing something that the owners were doing. No, but my point is that what the observer is collecting for her own report, which isn't shared with the vessel owner or operator, is extensive and more than just biological information. I understand, I think, your point. Yes. Thank you. And I think that really does speak to how their function is, I mean, it's just unprecedented, I think. And, again, there's no case or other context in statute that the government has yet been able to point to where somebody who serves that kind of enforcement purpose is funded by regulated entities. I mean, and I think for that and for all the reasons in the record. So the record said that. And Walker had another question, and I asked, too. No, no worries at all. The record had something last time, I think again this time, that the costs per trip could be as high as around $700. Correct. The government said that over the course of a year or two, there were only $30,000 in costs to the industry that went toward paying these monitors. So I am hardly a math major here, but I think that comes out to about 42 trips total, which can't, I think, possibly be the number of trips that happened over two years. So I don't know. I'm happy to speak to that, but I'll be giving you information that's not in the record. I think the government opened the door to that, and then we can decide what to do. So the problem with the notice is that it doesn't disaggregate the totals for the reimbursements according to what went where. So for portside sampling costs, portside infrastructure improvement, and then monitor training. Some of the reimbursements actually went to the monitoring service providers to train more monitors. We got from the council something of a breakdown, and our understanding is that only three trips were reimbursed. None of those were our clients. There were three trips early on before COVID. I think it was before COVID when they started waiving trips coverage. There were only three trips reimbursed, and at the bulk, $22,000 or $22,400 went to infrastructure, $4,700 to training, and $3,000 to sampling, which included portside and at sea. Why were only three trips reimbursed? That's a question for... There was a very brief time, given how the fishing year started, and when COVID hit in March and government stopped making the observers go on boats and so forth. Okay. Thank you, council. Thank you to both council. We'll take this case under submission.
judges: Srinivasan; Srinivasan; Walker; Walker; Rogers; Rogers